Good morning, your honors, and please the court. My name is Stephen Fixley. I represent Annette Basa. I was appointed by the court to represent her, and as the court knows, a very serious and difficult case involving sex trafficking of children. As the court is aware, my client did enter a plea of guilty to one count of the indictment, and just briefly the events, as the court knows, given rise to the complaint, all occurred in the island of Saipan back in 2013, between April and July of that year. My client was charged two count indictment of sex trafficking with children under the 18 U.S.C. 1591A. I'm going to short circuit this because you have a limited amount of time, and as I understand it, you're challenging only the sentence. That's correct, your honor. And the sex circuit, I believe it is, has decided one of the issues against the position that you're taking on, whether your client had to be specifically involved with one of the sex acts to be guilty or to have the section, whatever it is, 2G13B4A apply to her sentence. So would you comment on why you think the sex circuit came out wrong on that issue? Your honor, I was preparing for this hearing all day yesterday, and it gets a little complicated with just keeping track of the different numbers, the alphabets, but this would be an enhancement under the specific offense characteristics of... Of involved in the commission of a sex act. Right, and that was B4A enhancement. Your honor, I would just take note that the... I'm trying to answer your question, Justice Graber. There was a decision by the Ninth Circuit, which coincidentally was issued by this court the same day I filed the brief in this case, which was actually a case that was authored by Justice Christen, which was the Hornbuckle case, which also touched on this issue. Your honor, I'm looking at the plain language of the sentencing guideline enhancement, and I would just argue to the court that it's unclear on this enhancement whether the defendant needs to be... in the commission of a sex act, or whether it can be done through pimps or surrogates, and that's basically the question. It's just our position that this issue has not been clearly decided at this circuit, and that's our argument, your honor. Your honor, if you just go through procedurally, the original pre-sentence report was issued by the... submitted by the probation office in June of 2014. Some six months later, the government objected, filed an untimely objection, which was allowed by the court, and asked for the two enhancements, which was the specific offense characteristics under B-2-B, which was the unduly influence of minor, which was not contested by the defense. As the court knows, a rebuttable presumption applies if there's a 10-year differential on ages, and that was clearly present in that case. And then the second, which Justice Grabers referred to, was the enhancement based on commission of a sex act or sexual contact. Your honor, the court read the record. It's a fairly lengthy sentencing hearing that was conducted by the district court judge. The judge, the issue of whether the defendant, whether it was required of the defendant to actually engage in the sex acts, was actually raised sua sponte by the court. If you look at the government excerpt of record at page 98, that was the issue raised, and the court basically said on the record that their initial inclination was to sustain the objection, because you cannot find any cases that supported showing that the defendant did not have to actually engage in sex with the minor children involved in sex trafficking. And again, I do notice in the Hornbuckle case that I referred to earlier, that case actually involved these two same enhancements, the undue influence as well as the commission of a sex act or sexual... But it dealt with them in terms of double counting and not in terms of whether one of them applied at all. Absolutely, your honor. That's a different case. And in that case, as the court's aware, that case involved a situation where the three sisters, I believe, Hornbuckle sisters, did not engage in sex with the victims in that case. And the issue for the court was the case stated that the enhancement under B4A, which was the commission of a sex act or sexual contact, would not be double counted in that situation, because having sexual contact with a minor was not an element of the underlying offense. Now there was actually three issues originally advanced in our opening brief. I think the plea agreement precluded appeal and the government conceded that it does. I'd like to just address briefly the remaining issue, your honor, which was the defendant's motion under USSG 5K2.13 for a downward departure based on diminished capacity. Before I get started on that, I recognize my client has a huge mountain to climb in this issue. And I realize that the standard of review is abuse of discretion. This is a difficult case, as I said. As the record reflects, I represented Ms. Bossa from the beginning. I became very concerned about her mental condition. I asked the court to appoint a psychiatrist through an ex parte hearing, which was conducted on November 1, 2013. Dr. Laura Post was appointed, and as the court knows, she testified at the sentencing hearing extensively. And she's a board certified psychiatrist. She testified that Ms. Bossa suffered from various psychiatric problems, including post-traumatic stress syndrome. She had been sexually abused as a child. Some of the abusers were police officers. One of the police officers during the relevant time period in this case threatened to kill her if she disclosed any of this information. And all those factors led Dr. Post to conclude that she was substantially impaired under many of these guidelines. And the second step, obviously, is whether there was causation, whether the substantial impairment substantially contributed to the commission of the crime. And that's where we ran into some difficulties with the court. The court basically concluded that there was insufficient causation, showing that there was a causation between the impairment and the commission of the crime. Counsel, how did the doctor say that PTSD caused a reduced mental capacity? I understand that she may have been emotionally scarred. It may have been a terrible, terrible thing. But even when we have soldiers coming back with PTSD, we don't usually suggest that their IQ has gone down, if they're otherwise suffering from mental capacity, even though they may be incapacitated in many other ways. I just asked the court to look at the answer to the question, Justice Bybee. This court back in 1993 in the U.S. versus Camp 2 case actually talked about that issue. And that case involved a Vietnam veteran who was a combat veteran who was involved in an altercation in a bar. He was actually an alcoholic, too. And he was eventually charged, convicted of felony possession of a firearm. And the court in that case talked about specifically post-traumatic stress syndrome and stated that that was a... I can find it here, Your Honor. I just looked at the case. Anyway, they recognized that post-traumatic stress syndrome can lead to a diminished capacity. I like the language in that case, Your Honor. It's the Camp 2 case. The court said, basically defining that term, and I'll just read a quote from the court's decision, in everyday language, reduced mental capacity refers to a lack of full intellectual functioning. I believe Dr. Post, and it was a rather lengthy testimony, as you know, found that the sexual abuse primarily led to the post-traumatic stress syndrome, which basically led to what she styled an acute psychic disorder. She also described other psychiatric problems. Learning disability was another one that she had. And we know from the record that she did not finish school. I think she may have gone to the third grade. How did the learning disabilities contribute to her condition? If I understand Dr. Post's testimony, and I was not a psychiatrist, but she concluded that the learning disability, together with the other factors, led to what she described as an inability to distinguish right from wrong. What was the nature of her learning disabilities? She described it as a complex combination of intellectual disability. She also testified that that particular learning disability was present all the time. It was one of the problems the court had with the... I guess I don't understand what the psychiatrist means by learning disabilities. What learning disabilities did she have? I mean, ordinarily we talk about learning disabilities. We might be talking about dyslexia. We might be talking about other kinds of things like that, Asperger's. What did she have? She described an intellectual disability, and she used that terminology during the hearing. Specifically, I'm not certain... Counsel, one problem is that we might think that anybody who would commit a crime, particularly an awful crime like this, shows impaired judgment. I mean, I think that we could say, gee, you showed really bad judgment. When my kids came back and did something wrong, I would say, that was really bad judgment. But I don't always describe that as having diminished capacity or a learning disability. And if once somebody did have a learning disability, you might have some difficulty linking the learning disability with the bad judgment. So what's the link here? Your point's very well taken. Based on my review, and I was there at the hearing and spent a lot of time reviewing the hearing, I think it was a combination of all those factors that I mentioned earlier. It wasn't necessarily the learning disability, although she said that was present all the time, but, again, the post-traumatic stress syndrome, the anxiety, and the other psychiatric problems that she described all in combination cause a diminished capacity. And it was her opinion that the diminished capacity did, in fact, substantially contribute to the commission of the crime. Counselor, you've exceeded your time, but we'll give you some rebuttal when the time comes. Thank you, Your Honor. Mr. Bakke. Good morning, Your Honor. Scott Bakke on behalf of the United States. Just to pick up on one of those last points that was just being discussed, Dr. Post's testimony was just the mental impairment was something she was born with. She had, with day one, the PTSD was from the sexual abuse she suffered, but the court is right to question the relevancy of it. It was never linked up. It was never pointed to as a basis or a cause. And do we have anything more specific as to what the mental impairment was that she was born with? Other than what is contained in the report, which I believe is part of the record in the transcript, but nothing we would submit that was flushed out to cause a link. It was just that she seemed to have a lower IQ is my understanding of what Dr. Post was testifying to. Defense counsel referred to Cantu. Cantu is a very old case interpreting a different version of 5K2 where I don't even think the language, it didn't have to significantly cause, it was just cause at the time. So the language has been. But there's no question that Cantu said the PTSD can be a mental impairment. Absolutely. You're not contesting that. We're not contesting that. And that is the holding of Cantu. I think Cantu has quite a bit of dicta in it. But the holding is that PTSD could serve as a basis, and we wouldn't disagree with that, but then you have to move to the next part, which is the link and the cause. But in Cantu, it was only required to be, at the time Cantu was reached, it was just cause. Now it is significantly cause. Also, Cantu Doe, if I might take a positive spot, is that it did talk about voluntary intoxication. In Cantu, that defendant proved, or at least his expert showed, that his use of drugs was tied to the PTSD. There was a reason that he engaged in, that he was an alcoholic, is because he suffered from this. Here, we do not have that. We have tons of evidence about methamphetamine by the defendant, by the victims, but at no point in time did this expert offer an opinion that the PTSD somehow made her unable, or drove her to methamphetamine. As the record stands right now, she voluntarily used methamphetamine on numerous occasions through the course of her criminal conduct, which spanned many months. Although that doesn't seem like a very big leap to go from having PTSD to drowning your sorrows in. It isn't, but I would still submit something needs to be proven, and it was one of the bases the court rendered. The court's basis for finding that the defendant did not carry a burden were causation, the possibility of malingering, and voluntary drug use. So the court was, I see tons of meth in this case, and no reason to conclude that that wasn't more of a reason for what you did than stuff that happened in the past. If I may back up in time, just to address very briefly the defense arguments regarding 2G1.3, and whether sexual conduct is required. As politely as I can state, of course, it's not required to be committed by the defendant. It's a completely logical and appropriate application of relevant conduct. Assuming relevant conduct does not apply, which it does, the specific offense characteristics in 2G1.3 clearly show that the Sensing Commission knows how to differentiate when the defendant needs to have committed it, and when it's the offense. Because in 2G1.3, it says the defendant, blank, add two points, if the defendant improperly influenced. The one that we're talking was, did the offense involve the commission? So obviously, that is telling the court, the sentencing court, to look broader, look farther out than just what the defendant did. Look at the scope of the offense and what occurred. Lastly, it is in line with this court's holdings that a sex act is not required for a conviction under 1591. Something that we discussed yesterday, but it is not a requirement that a sex act actually occur. But if it does occur, then you are going to get the two-point enhancement. And so that, again, logical and in line with the plain language of the sentencing guidelines. Returning to Dr. Post's testimony regarding diminished capacity, this is really a proof issue. We are on appeal. This is the district court that heard the testimony, that provided the reports, got to view Dr. Post's testimony, and in the end said the defendant had not carried her burden. And so I think that is quite a hill to climb for the defense to overcome at this point in time. One thing I do want to stress, and I do think that was underpinning the court's decision was, at no point in time, if you read the excerpts, at no point in time did Dr. Post ever say that she had a substantial impairment that significantly caused this crime. It wasn't in any of her reports up until the day of sentencing. And that is one of the reasons the AUSA at the time objected, because she hasn't even connected the dots now, so she shouldn't be able to connect the dots now on testimony. She got up, she testified, never elicited through defense attorney's questioning, and at some point in time she did link it up on one brief exchange, which defense counsel cited to where the AUSA asked the question, and she said yes. But the district court, viewing the whole hearing, reading the reports, viewing the live testimony, in the end said that the defense did not carry the day. And I think based on the record, based on the findings that were articulated by the district court, it is impossible to conclude that the district court abused its discretion in this case. I have nothing further, unless the court has any questions. I don't believe we do. Thank you, Mr. Baraki. Thank you, Your Honor. Next thing, you may have a minute for rebuttal, if you'd like. You know, again, we acknowledge that it's a tough case. My client received 210 months in prison, and she's currently serving her time in Ellisville, Alabama, so it's a very important case for her. She asked me to appeal her case, and I'm trying to do that. I'd just like to go back to Dr. Post's testimony very briefly. I think it may be relevant, and I think one of the problems we had with Dr. Post, and it's a basic problem we have in Sitepan, and I raised this during the hearing, is the lack of mental health providers in Sitepan. We're a small island. In fact, there are very few psychologists or even psychiatrists on the island, maybe one. Dr. Post, as you'll see from the record, filed, as I said earlier, it was an ex parte request with the court when I became concerned about her competency, to hire Dr. Post, and she flew up from Guam, and was only there several times. She visited with my client, who was in custody during this whole proceeding, two times, and then repaired it at the sentencing hearing. One other problem, and I think this may be relevant to our discussion, the government filed a late objection, as I said earlier, to the pre-sentence report. For six months, they didn't object at all to the original pre-sentence report, which basically recommended 10 years, which is significantly less than 17. And they filed this out-of-time request, which the judge granted, and asked for these two enhancements, which increased the potential sentencing substantially. In fact, it got to a level of 35. And Dr. Post, the last pre-sentence report, and in hindsight, perhaps I should ask for a continuance of the hearing, but the last pre-sentence report was submitted one week before the hearing. There were new facts in that, and Dr. Post was looking at that, and she testified that some of her conclusions or opinions at trial were based on the new facts she saw in the PSR. So to the extent that's relevant, I think it may be, I'd like the court to be aware of that. Thank you, counsel. We appreciate the arguments that both of you have brought to us today, and the case is submitted.
judges: Graber, Bybee, Christen